IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MICHELE GRANT and DANIEL PATRICK GRANT, Individually and as Next Friends of D.G., a Minor Child, | CIV. NO. 25-00259 JMS-KJM |
| Plaintiffs, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS, ECF NO. 21 |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS, ECF NO. 21

## I. INTRODUCTION

Defendant United States of America (hereinafter "Defendant" or "the government") seeks to dismiss this medical malpractice suit brought against it under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. ("FTCA"). The Motion to Dismiss, ECF No. 21, argues that the suit is barred by the two-year limitations period in 28 U.S.C. § 2401(b).  As explained to follow—accepting its well-pleaded factual allegations as true—the Complaint adequately alleges facts that could establish that the claim did not "accrue" outside the limitations period (i.e., Plaintiffs did not know the cause of the injury).  And even if the claim accrued no later than September of 2018 (as the government argues), when D.G. was diagnosed with cerebral palsy, the Complaint's allegations—again, taken as true—

establish tolling under the doctrine of fraudulent concealment (equitable estoppel). In short, the statute of limitations issues cannot be decided definitively at this motion-to-dismiss stage.  Accordingly, the Motion to Dismiss is DENIED.

## II. <u>BACKGROUND</u>

Plaintiffs Michele and Daniel Grant ("the Grants") brought this FTCA suit on June 24, 2025, individually and as parents on behalf of their minor child, D.G., who was born in 2017 at the Tripler Army Medical Center ("Tripler") in Honolulu, Hawaii.  *See* ECF No. 1 at PageID.2.[1]  Because the Motion to Dismiss concerns only the statute of limitations, this background section focuses on the Complaint's facts relevant to accrual and tolling.  The 55-page Complaint alleges the medical malpractice in detail, but the court here sets forth only enough allegations to provide context for the statute of limitations issues.[2]

### A.    Broad Overview

The court starts with a basic and broad overview of the case.  Michele gave birth to D.G. at Tripler on January 6, 2017, having been admitted on January

---

[1]  The court where appropriate refers to the Grants and D.G. collectively as "Plaintiffs." As does the Complaint, the court refers at times to Michele Grant as "Michele" and Daniel Grant as "Dan."

[2]  The court assumes the well-pleaded allegations of the Complaint are true for purposes of this Motion to Dismiss.  *See, e.g.*, *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1158 n.1 (9th Cir. 2019); *see also Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (applying same principle in analyzing statute of limitations issues).

5, 2017, after developing painful contractions.  D.G. was Michele and Dan's second child.  Their first child was born by Cesarean section ("C-section").  Michele was intending to give birth to D.G. vaginally, via a "Trial of Labor After Cesarean Section (TOLAC) followed by a Vaginal Birth After Cesarean Section (VBAC)" ("TOLAC/VBAC").  ECF No. 1 at PageID.5 ¶ 22.  At some point during D.G.'s birth process early in the morning on January 6, 2017, Michele's uterus ruptured (although it is unclear when Tripler personnel knew or should have known of the rupture).  Initially, Tripler personnel called for an "emergency" C-section, which would have meant an immediate delivery.  But Tripler health care providers then downgraded the C-section from "emergent" to "urgent," resulting in delay.  *Id.* at PageID.16 ¶ 100.

During the C-section, "[u]pon entering the abdomen, D.G. was found to be outside the uterus, free floating and deprived of oxygen."  *Id.* at PageID.17 ¶ 105.  At 6:10 a.m., "D.G. was born grey and lifeless with a heartbeat of 10 bpm." *Id.* ¶ 107.  D.G. was born with brain damage; Dr. Laura Keller (presumably a pediatrician or pediatric neonatologist) documented "severely depressed infant with abnormal neurological exam consistent with Sarnat Stage III," *id.* ¶ 112, which is "the most severe category of encephalopathy."  *Id.* at PageID.18 ¶ 113.  D.G. was admitted to the Neonatal Intensive Care Unit ("NICU") for "severe

3

Hypoxic Ischemic Encephalopathy (HIE) or brain damage due to oxygen

deprivation." *Id.* ¶ 116.  On January 6, 2017, Dr. Keller documented:

> High risk of poor neurodevelopmental outcome given
> profoundly abnormal APGARS/cord gases/seizures
> starting at less than 1 HOL.  Discussed with father of
> infant that initial injury has already taken place and
> cannot be reversed, however, goal of therapeutic
> hypothermia is to limit a secondary reperfusion injury.
> Will need close follow up with pediatrics/early
> interventions as outpatient.

*Id.* ¶ 118.  And "[a]t 20 months of age [in approximately September of 2018], D.G.

was diagnosed with cerebral palsy, caused by HIE during labor and delivery."  *Id.*

at PageID.19 ¶ 123.

The Motion centers on when the cause of action accrued—

specifically, whether Plaintiffs knew or should have known the "cause" of the

injury alleged in the Complaint outside the limitations period.  The Complaint

plainly alleges that Michele and Dan knew on January 6, 2017, (1) that Michele's

uterus had ruptured during labor and (2) that "D.G.'s brain had been injured

because D.G. had been deprived of oxygen due to uterine rupture."  *Id.* ¶ 125.  But

it also alleges that they did not know the time of the rupture, nor whether D.G.'s

severe brain injury could have been avoided by an earlier C-section, nor whether

the resultant delay was the legal cause of D.G.'s brain injury.  *Id.* at PageID.20

¶¶ 126–128.  To provide the context for the accrual and causation questions, the

court also explains the alleged malpractice.  And although the Complaint details

4

several specific instances of malpractice, the primary alleged malpractice centers on two broad areas described next: (1) Pitocin and (2) heart monitoring.

**B.    Pitocin**

When Michele was admitted to Tripler, she was told that she would be receiving Pitocin to augment labor. *Id.* at PageID.4 ¶ 21. "Pitocin, a.k.a oxytocin, is a synthetically prepared hormone that stimulates contractions of uterine smooth muscle." *Id.* at PageID.6 ¶ 28. Michele told Dr. Collin A. Sitler, D.O., that she did not want Pitocin because she read that it increases the risk of uterine rupture with a vaginal delivery with a prior C-section, i.e., a TOLAC/VBAC. *Id.* at PageID.5–6 ¶¶ 24–25. "Dr. Sitler told Michele that Pitocin does ***not*** increase the risk of uterine rupture in the context of a TOLAC/VBAC." *Id.* at PageID.6 ¶ 26. This was allegedly contrary to a standard warning that accompanies oxytocin. *Id.* ¶ 29. The Complaint alleges that "Dr. Sitler's statement, that Pitocin does not increase the risk of uterine rupture in the context of a TOLAC/VBAC, was an affirmative misstatement to Michele and a fraudulent concealment of the risks posed by Pitocin in the context of a TOLAC/VBAC." *Id.* ¶ 27. "Due to Dr. Sitler's affirmative misstatement and fraudulent concealment, Michele agreed to Pitocin." *Id.* ¶ 30.

Pitocin was administered to Michele overnight beginning at 4:00 p.m. on January 5, 2017. *Id.* at PageID.8 ¶ 39. At approximately 4:49 a.m. on January

6th, Michele felt a very painful burning sensation across her lower abdomen, despite an epidural.[3]  *Id.* at PageID.9 ¶¶ 45–46.  "The ability of Michele to feel a very painful burning sensation across her lower abdomen, below her belly button, despite an epidural, indicated that at approximately 4:49 am, Michele's uterus was beginning to tear."  *Id.* ¶ 47 (emphasis omitted).  "Despite the warning signs of pain overriding an epidural and a burning sensation along the lower abdomen, [second year resident] Dr. [Caitlin] Grandillos did not discontinue Pitocin, did not order a decrease [of] the dosage of Pitocin, nor move Michele to the [operating room]."  *Id.* at PageID.10 ¶ 48.

## C.    Heart Monitoring

At about 5:21 a.m. on January 6th, signs arose indicating fetal intolerance of labor.  *Id.* ¶ 57.  D.G.'s fetal heart strip ("FHS"), measured from an external monitor placed on Michele, documented a fetal heart rate of over 160 beats per minute ("bpm") or fetal tachycardia (irregular heart rate).  *Id.* at PageID.11 ¶ 58.  Tripler personnel then improperly "instructed Michele to perform a 'test push,'" which—with a TOLAC/VBAC and her symptoms—increased the risk that Michele's uterus would rupture.  *Id.* ¶¶ 63–64.  At 5:39 a.m., Michele

---

[3]  Colloquially, an "[e]pidural anesthesia is an injection of anesthetic medication into [the] epidural [spinal] space" that "blocks feeling and pain."  https://my.clevelandclinic.org/ health/treatments/21896-epidural (viewed February 12, 2026).

performed the push, causing D.G.'s heart rate to crash from 160 bpm down to 60 bpm, indicating that Michele's uterus had ruptured.  *Id.* at PageID.12 ¶¶ 68, 72. Michele was brought to an operating room for an emergency C-section, where D.G.'s heart rate continued to be measured as a dangerously low 60 bpm by an internal fetal scalp electrode ("FSE") placed on D.G.  *Id.* at PageID.14 ¶ 87. Meanwhile, a different external heart rate monitor placed on Michele recorded Michele's heart rate at 100 to 110 bpm.  *Id.* ¶ 89.

Tripler personnel mistakenly identified Michele's heart rate of 100 to 110 bpm as *D.G.'s* heart rate (although D.G.'s FSE had been recording D.G.'s rate at 60 bpm).  Believing that D.G.'s heart rate had "recovered" to 100 to 110 bpm, Tripler personnel detached D.G.'s internal FSE and downgraded the C-section from "emergency" to "urgent."  *Id.* at PageID.14–15 ¶¶ 90–96, 99.  Given the downgrade, the C-section was delayed and did not begin until 6:03 a.m., *id.* at PageID.16 ¶ 102, where D.G. was found outside the uterus as described earlier.  On January 6, 2017, Dr. Keller (the pediatrician/neonatologist) made a newborn assessment notation stating:

> decision made by OB team that FSE was not picking up
> appropriately and to use ultrasound [heart rate] instead.
> As [heart rate] noted in low 100s, decision was made to
> convert from stat [C-section] to urgent [C-section].  At
> the time of [C-section] noted uterine rupture.

*Id.* at PageID.18 ¶ 114.[4]

### D.    Alleged Instances of Affirmative Misrepresentation or Fraudulent Concealment, and Inquiry from the Grants

The Complaint alleges several instances of Tripler personnel affirmatively misrepresenting facts to avoid liability or otherwise prevent Plaintiffs from discovering negligence.  Plaintiffs allege that on January 6, 2017, Dr. Sarah Rabie (an attending physician who had come to the operating room to assist with delivery) placed a note in Michele's medical record stating "[in] [operating room], [fetal heart rate] recovered to the 90-100s maternal heart rate verified to be different on pulse ox."  ECF No. 1 at PageID.21 ¶ 138 (emphasis omitted).  The Complaint alleges that this statement was false for several reasons, *id.* at PageID.21–22 ¶¶ 139–144, and that "the intent of Dr. Rabie's [January] 6, 2017 affirmative misstatement and fraudulent concealment of facts demonstrating that the fetal heart rate never recovered to the '90-100s' was to induce reliance by Michele and Dan, and to avoid liability by the USA."  *Id.* at PageID.22 ¶ 145 (emphasis omitted).

At an April 6, 2017 visit, Michele asked D.G.'s pediatrician if she knew what happened during D.G.'s labor and delivery.  The pediatrician told

---

[4]  The Complaint describes the circumstances regarding the alleged mix-up between Michele's and D.G.'s heart rates in much greater detail.

Michele "some neonatologists felt that something might have gone wrong in

D.G.'s labor and delivery," that "an internal investigation was happening," and "it

may be possible that they were tracking your heart rate, and not the baby's." *Id.* at

PageID.21 ¶¶ 133–135.  She also told Michele that the C-section "could have been

performed much faster, saying it's possible to 'slap some betadine on there and get

the baby out in a minute.'" *Id.* ¶ 137.

      After that conversation with the pediatrician, Michele met with Dr.

Rabie on June 20, 2017.  Michele asked Dr. Rabie whether Tripler had been

tracking Michele's heart rate and not D.G.'s in the operating room when Tripler

decided to "slow things down." *Id.* at PageID.23 ¶ 151.  "On June 20, 2017, Dr.

Rabie emphatically denied tracking Michele's heart rate instead of D.G.'s," *id.*

¶ 152, and "insisted that . . . D.G.'s heart rate had 'recovered' at the time that the

OR team had decided to 'slow things down,' stating, 'I've looked at the fetal heart

strips multiple times.'" *Id.* at PageID.24 ¶ 153.  The Complaint alleges:

> Dr. Rabie's assertion that the OR team had been tracking
> D.G.'s heart rate in the OR at the time that they decided
> to "slow things down" constituted an affirmative
> misstatement and fraudulent concealment of facts in that
> it deprived the Plaintiffs of a full understanding of the
> true facts.

*Id.* at PageID.25 ¶ 156.  It further alleges:

> Upon information and belief, the intent of Dr. Rabie's
> June 20, 2017 affirmative misstatement and fraudulent
> concealment of facts disproving her assertion that the OR

> team had been tracking D.G.'s heart rate in the OR at
> [sic] time that they decided to "slow things down" . . .
> was to induce reliance by Michele and Daniel and to
> avoid liability by the USA.

*Id.* ¶ 157.

Michele also asked Dr. Rabie whether the use of Pitocin had increased

the risk of uterine rupture, which Dr. Rabie denied, stating "we do this all the

time." *Id.* at PageID.26 ¶¶ 160–161. The Complaint likewise asserts that this

statement was false, and constituted an affirmative misrepresentation that

"deprived the Plaintiffs of a full understanding of the true facts," *id.* ¶ 162, and was

made to avoid liability, *id.* at PageID.27–28 ¶ 170.

Similarly, on October 14, 2017, Michele met with Dr. Alan Gehrich,

the Chief of Obstetrics/Gynecology at Tripler. Dr. Gehrich told Michele that he

could not tell her the results of the internal investigation of her delivery of D.G. *Id.*

at PageID.28 ¶ 177. Michele then asked Dr. Gehrich what happened during labor

and delivery, and "Dr. Gehrich told Michele that after an acute deceleration to 60

bpm, D.G.'s heart rate had 'recovered' and had gone up to 110 bpm." *Id.* at

PageID.29 ¶ 179. The Complaint alleges that this statement was false because

"[t]he [United States] had knowledge of the true facts indicating that D.G.'s heart

rate had not recovered to 110 bpm," *id.* at PageID.30 ¶ 181, for many reasons

detailed in the Complaint, *id.* at PageID.29–30 ¶¶ 180 (a)–(k). And the Complaint

alleges that "the intent of Dr. Gehrich's October 14, 2017 affirmative misstatement

and fraudulent concealment of facts disproving his claim that D.G.'s heart rate

'recovered' to 110 bpm in the OR, was to induce reliance by Michele and Dan and

to avoid liability." *Id.* ¶ 183.

       Likewise, on October 14, 2017, Dr. Gehrich: (1) denied to Michele

that the Tripler team had been tracking Michele's heart rate instead of D.G.'s, *id.* at

PageID.31 ¶ 186; (2) told Michele that the internal FSE on D.G. had been removed

"to prep for surgery," and that "D.G.'s heart rate 'must have' crashed only after

[Tripler] had removed the FSE," *id.* at PageID.35 ¶ 206 (emphasis omitted); and

(3) told Michele "it took '26 minutes' from D.G.'s acute deceleration to 60 bpm to

time of delivery," *id.* at PageID.32 ¶ 192, and that "30 minutes is the 'standard' to

'get the baby out,'" *id.* ¶ 195.  These affirmative misstatements "deprived Plaintiffs

of a full understanding of the true facts," and were made "to induce reliance by

Michele and Daniel and to evade liability."  *Id.* at PageID.35 ¶¶ 207–210.

**E.    Consultation with an Attorney in August 2018, and Subsequent
Discovery**

       In August of 2018, Michele contacted an attorney (not present

counsel) and sent the attorney her and D.G.'s medical records.  *Id.* at PageID.36

¶ 214.  The attorney told Michele that the attorney "could not see a case for

negligence being made against the USA," *id.* at PageID.37 ¶ 215, because

Dr. Rabie had documented on January 6, 2017 "[in] [operating room], [fetal heart

rate] recovered to the 90-100s maternal heart rate verified to be different on pulse

ox," *id.* (quoting ECF No. 1 at PageID.21 ¶ 138). This is one of the statements that the Complaint alleges was an affirmative misrepresentation made for the purposes of avoiding liability.

The Complaint alleges that Plaintiffs, like the attorney, relied on the affirmative statements and representations of Tripler doctors regarding the facts and did not pursue the matter further until May of 2024. On May 2, 2024, Michele sought disability benefits from the Veterans Administration, and, needing to explain her condition to a disability board, she began to review her and D.G.'s medical records. *Id.* at PageID.38 ¶ 220. In September of 2024, she saw Dr. Keller's notation:

> . . . decision made by OB team that FSE was not picking up appropriately and to use ultrasound HR instead. As HR noted in low 100s, decision was made to convert from stat C/S to urgent C/S. At the time of C/S noted uterine rupture.

*Id.* ¶ 221 (quoting PageID.18 ¶ 114). She then suspected that Tripler doctors had lied to her because they had told her facts different than that "the FSE had not been 'picking up appropriately.'" *Id.* ¶ 222.

After contacting current counsel, and a subsequent investigation, Plaintiffs filed an FTCA administrative claim on December 18, 2024. *Id.* at PageID.3 ¶ 8. They filed this action on June 24, 2025, alleging counts for medical negligence, negligent infliction of emotional distress, loss of consortium, and lack

of informed consent. *See generally* ECF No. 1. The government now moves to dismiss on statute of limitations grounds.

## III. <u>STANDARD OF REVIEW</u>

If apparent from the face of the complaint, a statute of limitations defense may properly be raised in a motion to dismiss. *See, e.g.*, *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013). Dismissal is proper "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (citation and quotation marks omitted). "In making this determination, the court must (1) accept as true all the well-pleaded factual allegations contained in the complaint, then determine (2) 'whether the running of the statute is apparent on the face of the complaint.'" *Thunderfoot v. United States*, 2023 WL 5413852, at *9 (D. Haw. Aug. 22, 2023) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)). More generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet

that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions." *Id.* (citing *Twombly*, 555 U.S. at 555).[5]

---

[5] Plaintiffs cite *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) for the proposition that a complaint cannot be dismissed on limitations grounds unless "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." ECF No. 31 at PageID.186. *See also, e.g.*, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (same) (quoting *Supermail*). The "no set of facts" standard, however, was discredited in *Twombly*/*Iqbal*, where the Supreme Court adopted a "plausibility" standard. After *Twombly*/*Iqbal*, some courts have applied the plausibility standard when assessing a complaint's adequacy in a statute of limitations context. *See, e.g.*, *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 115 (S.D.N.Y. 2016) ("Rule 12(b)(6)'s plausibility standard applies equally to motions to dismiss based on a statute of limitations defense") (citation omitted); *Mesones v. Estevez*, 2021 WL 3721324, at *4 (11th Cir. Aug. 23, 2021) (unpub.) (reasoning that "[t]he plausibility standard is the proper standard for evaluating whether Plaintiffs adequately alleged they were entitled to equitable tolling," and rejecting the "old, 'no set of facts' standard under *Conley v. Gibson*, 355 U.S. 41 (1957)") (citation omitted).

Nevertheless, both the Ninth Circuit and numerous district court decisions sometimes continue simply to cite *Supermail Cargo* and *Von Saher* for the "no set of facts" standard in challenges based on statute of limitations issues. *See, e.g.*, *Syed v. M-I, LLC*, 853 F.3d 492, 507 (9th Cir. 2017) (citing *Supermail*); *Est. of Wuxi Chenhwat Almatech Co. v. Prestige Autotech Corp*, 2024 WL 4100241, at *1 (9th Cir. Sept. 6, 2024) (mem.) (citing *Von Saher* and *Supermail*); *Thunderfoot*, 2023 WL 5413852, at *9 (citing *Von Saher*); *Baptiste v. Dep't of Def.*, 2024 WL 6083535, at *5 (D. Haw. June 24, 2024) (citing *Von Saher* and *Supermail*).

There may well be a reason why a "no set of facts" standard survives when analyzing statute of limitations issues. The Seventh Circuit appears to reject a plausibility standard when analyzing a complaint's sufficiency on a timeliness challenge because "[p]laintiffs are not required to anticipate or refute potential affirmative defenses in the complaint." *Reilly v. Will Cnty. Sheriff's Office*, 142 F.4th. 924, 930 (7th Cir. 2025) (applying a rule that "a claim will survive dismissal 'as long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense . . .'") (quoting *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015)). The Ninth Circuit, however, does not appear to have likewise specifically grappled with whether a "no set of facts" standard survives *Twombly*/*Iqbal* when a complaint is challenged on timeliness grounds.

The court, however, need not address whether to apply a "no set of facts" standard here. As explained to follow, Plaintiffs Complaint easily satisfies the more general *Twombly*/*Iqbal* standard as plausibly alleging that their claims did not accrue outside the limitations period, and that fraudulent concealment would otherwise apply.

14

"A defendant raising the statute of limitations as an affirmative

defense has the burden of proving the action is time-barred. . . . Thus, the

defendant has the burden of demonstrating the complained of wrongdoing *and*

harm occurred outside the limitations period."  *Kahler v. United States*, 2025 WL

2418451, at *5 (D. Haw. Aug. 20, 2025) (quoting *Cal. Sansome Co. v. U.S.*

*Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995)).  *See also, e.g.*, *Saofaigaalii v. United*

*States*, 2016 WL 3527095, at *6 (D. Haw. June 23, 2016) ("Because the FTCA's

statute of limitations is not jurisdictional, failure to comply with it is merely an

affirmative defense which the defendant has the burden of establishing.") (internal

quotation marks and citations omitted).[6]

## IV.  <u>DISCUSSION</u>

A.    **Accrual—Discovery of "The Injury and Its Cause"**

*1.    Accrual Standards Under the FTCA*

A plaintiff making a claim under the FTCA against the United States

must present an administrative claim to the appropriate federal agency within two

---

[6]  *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015), held that 28 U.S.C. § 2401(b) is not jurisdictional and thus its time limits can be tolled on equitable grounds.  *See id.* at 412.  But "[t]he party seeking the benefit of the avoidance of the statute of limitations carries the burden of proof to establish the elements."  *N.L.R.B. v. Don Burgess Const. Corp.*, 596 F.2d 378, 383 n.2 (9th Cir. 1979).  Thus, if an FTCA defendant establishes that a cause of action accrued outside the applicable limitations period, a plaintiff then has the burden to establish a basis to toll or otherwise excuse the late filing.

years of when the claim accrues, or it is "forever barred."  28 U.S.C. § 2401(b).[7]

Under Ninth Circuit law, FTCA claims for medical malpractice accrue "when the

plaintiff discovers, or in the exercise of reasonable diligence should have

discovered, the injury and its cause."  *Tunac v. United States*, 897 F.3d 1197, 1206

(9th Cir. 2018) (quoting *Landreth ex rel. Ore v. United States*, 850 F.2d 532, 533

(9th Cir. 1988)); *see also Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir.

2001) ("It is well settled that the limitations period begins to run when the plaintiff

has knowledge of injury and its cause, and not when the plaintiff has knowledge of

legal fault.") (quoting *Rosales v. United States*, 824 F.2d 799, 805 (9th Cir. 1987)

(internal quotation marks omitted)).  "Accrual of a claim does not 'await awareness

---

[7] Section 2401(b) provides in full:

> A tort claim against the United States shall be forever barred
> unless it is presented in writing to the appropriate Federal agency
> within two years after such claim accrues or unless action is
> begun within six months after the date of mailing, by certified or
> registered mail, of notice of final denial of the claim by the
> agency to which it was presented.

Under this section, and under 28 U.S.C. § 2675(a), a court action is due within six months of notice of the final denial of the administrative claim (or six months after no action on a claim). *See Redlin v. United States*, 921 F.3d 1133, 1136 (9th Cir. 2019) (explaining that an FTCA "claim is timely only if it has been: (1) submitted to the appropriate federal agency within two years of accrual and (2) filed in federal court within six months of the agency's final denial"). "The failure of an agency to make final disposition of a claim within six months after it is filed shall . . . be deemed a final denial of the claim . . . ."  28 U.S.C. § 2675(a); *see, e.g.*, *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1121 n.1 (9th Cir. 2019) (applying 2675(a)).
     Here, it is undisputed that this action, filed on June 24, 2025, was brought within six months of "final denial of the claim" (i.e., from no final disposition of Plaintiffs' administrative claim, which was filed on December 18, 2024).  *See* ECF No. 1 at PageID.3–4.  Rather, the Motion to Dismiss concerns the first limitations period in § 2401(b), and whether the December 18, 2024 administrative claim was presented within two years after accrual.

by a plaintiff that his injury has been negligently inflicted.'" *Winter*, 244 F.3d at

1090 (quoting *United States v. Kubrick*, 444 U.S. 111, 123 (1979)).

"The 'cause' [of an injury] is known when the immediate physical

cause of the injury is discovered." *Dyniewicz v. United States*, 742 F.2d 484, 486

(9th Cir. 1984); *see also Kahler*, 2025 WL 2418451, at *6 ("[T]he Ninth Circuit

has directed courts to look at the *immediate physical or medical cause* of an injury

as the relevant cause when assessing timeliness.") (some emphasis added) (citing

*Dyniewicz*, 742 F.2d at 486, and *Gibson v. United States*, 781 F.2d 1334, 1344 (9th

Cir. 1986)); *Winter*, 244 F.3d at 1092 (finding no accrual in part because plaintiff

was "never told the medical cause of his injury").

But the Ninth Circuit has also "consistently held that a cause of action

does not accrue under the FTCA when a plaintiff has relied on statements of

medical professionals with respect to his or her injuries and their probable causes."

*Winter*, 244 F.3d at 1090; *see also Tunac*, 897 F.3d at 1207 (distinguishing *Winter*).

In upholding a district court's finding that a malpractice claim had not accrued,

*Winter* examined several prior Ninth Circuit cases applying that principle. *See,

e.g.*, *Raddatz v. United States*, 750 F.2d 791, 796 (9th Cir. 1984) (holding that

medical malpractice claim for negligent failure to diagnose and warn did not

accrue until plaintiff was aware of injury and its cause in part because "the Navy

doctor repeatedly assured [plaintiff] that her condition was a normal

consequence . . . . [and] [s]uch assurances may be reasonably relied on by a patient"); *Rosales*, 824 F.2d at 804 (holding that malpractice claim did not accrue in part because plaintiffs "relied on the assurances of the doctors that no harm had in fact occurred"). *Winter* reasoned in part that the plaintiff—a paraplegic who had previously been implanted with electrodes to attempt to restore his ability to walk—with a severe infection did not know the cause of that injury for accrual purposes when "he was clearly told [by his doctors] that the electrodes were not the cause of his infection," 244 F.3d at 1091, and that the plaintiff "was not told one word about the medical cause of his injuries, other than that it was highly *unlikely* to be the cause that he now alleges," *id.* at 1092.

### 2.    *Application of Accrual Standards*

Here, it is undisputed that Plaintiffs knew of the *injury* or injuries outside the two-year limitations period. Plaintiffs knew Michele's uterus ruptured on January 6, 2017, and knew by January 7, 2017, that D.G. suffered brain damage. ECF No. 1 at PageID.19 ¶¶ 123, 124. If the injury is considered more specifically to be D.G's cerebral palsy, they knew it was diagnosed in September 2018. *Id.* at PageID.19 ¶ 123. And so, the analysis here focuses on the second prong (causation). The question is whether—assuming the Complaint's factual allegations are true—Plaintiffs knew or should have known the "immediate physical or medical cause," *Kahler*, 2025 WL 2418451, at *6 (emphasis omitted),

18

of the injury or injuries more than two years before Plaintiffs made administrative

claims on December 18, 2024.

The answer is no.  It is not clear, based on the Complaint's allegations,

that Plaintiffs knew such "cause" outside the period.  "Accept[ing] as true all well-

pleaded allegations of material fact," *Seven Arts*, 733 F.3d at 1254, it is not clear

from the face of the Complaint that the claims accrued beyond the two-year period.

The precise analysis depends on whether the "injury" is considered to be solely

D.G.'s brain damage, or whether it also includes Michele's ruptured uterus.  But

either way—when considering factors discussed in *Winter*—the court cannot

conclude at this stage that Plaintiffs' FTCA claim accrued outside the limitations

period.

It is much too simple to conclude (as the government asserts) that just

because Plaintiffs knew on January 7, 2017, that D.G.'s condition resulted from

being born outside a ruptured uterus, Plaintiffs therefore knew the "cause" of

D.G.'s injury at that time.  Allegedly, they did not know the facts about how or

why Michele's uterus tore, nor did they know the facts as to why her C-section was

downgraded from "emergency" to "urgent."  Those facts, according to the

Complaint's allegations, included (1) administration of Pitocin, (2) being told to do

a "test push" after obvious signs of uterus rupture and fetal distress, (3) removing

the fetal scalp electrode ("FSE") from D.G., and (4) misidentification of Michele's

heartrate as D.G.'s heartrate.  This means they did not know the cause of the

rupture, and similarly they did not know the cause of the brain damage (e.g.,

removal of the FSE, misidentifying D.G.'s heart rate).  And they did not know

those facts because they relied on "statements of medical professionals with

respect to [plaintiff's] injuries and their probable causes." *Winter*, 244 F.3d at

1090.

         The government argues that discovery of those facts cannot lead to

accrual because they constitute the alleged negligence itself.  *See, e.g.*, *id*.

("Accrual of a claim does not 'await awareness by a plaintiff that his injury has

been negligently inflicted.'") (quoting *Kubrick*, 444 U.S. at 123).  Even if,

however, some of those facts also could constitute negligence, Plaintiffs are not

basing accrual on a theory that they only recently discovered that Tripler personnel

were negligent.  Rather, their theory is that they did not know—and reasonably

could not have known, given statements of Tripler doctors—such facts (whether

they constituted negligence or not) and therefore they did not know the cause of

the injury.  And this is so whether the question is viewed as the cause of the

ruptured uterus, or the cause of the brain damage to D.G.

         This situation is different from *Tunac*—relied upon by the

government—which found accrual because the plaintiff "knew, or reasonably

should have known, that the cause of the injury was the failure of the Hayden VA

Medical Center to provide adequate medical treatment." 897 F.3d at 1206. *Tunac* distinguished *Winter* and similar cases—i.e., as to the principle that accrual does not occur "when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes"—because, in *Tunac*, the plaintiff "knew or should have known that the VA's failure to provide timely treatment caused [plaintiff's husband's] death [and] [t]here is no evidence that [plaintiff] relied on inaccurate statements by a medical professional regarding the cause of her husband's death." *Id.* at 1207. Not so here. Rather, unlike *Tunac*, Plaintiffs here allege that they did not know the relevant facts regarding causation, and they allege—many times—that they relied on inaccurate statements from Tripler doctors regarding the causes of the injury or injuries.[8]

---

[8] This case is similar to *Kahler v. United States*, an FTCA suit alleging malpractice at Tripler during the birth of "KK." *See* 2023 WL 8850272 (D. Haw. Dec. 23, 2023). *Kahler* denied a motion seeking dismissal on limitations grounds, asserting that KK's injury (stroke and brain damage) resulted from KK's "large birth size," which was known at birth. *Id.* at *3. The complaint, however, alleged that the cause was "compression of [baby's] carotid artery," not KK's large birth size. *Id.* The court also rejected an argument that Plaintiffs were not diligent in discovering the cause, where the complaint

> allege[d] that Plaintiffs were *not* told that medical providers should
> have determined KK's size before labor, that a caesarian delivery
> should have been performed, that medical providers used
> "excessive force" during the delivery, that the use of such force
> caused the compression of KK's carotid artery and injury to her
> brachial plexus, and that the compressed carotid artery was the
> "likely cause" of KK's stroke and brain damage.

*Id.* at *3.

The government argues that Plaintiffs knew enough by August 2018 to suspect negligence because they consulted a lawyer for advice.  *See* ECF No. 1 at PageID.36 ¶ 214.  It also points to the following allegations in the Complaint regarding discovery of the negligence:

> Knowing that she would be required to explain [in 2024] the breadth of her injuries to the Veteran Affairs Disability Board, Michele began to read her medical records and D.G.'s medical records.
>
> In September of 2024, for the first time, Michele saw Dr. Keller's Newborn Assessment in D.G.'s medical records:
>
>> . . . decision made by OB team that FSE was not picking up appropriately and to use ultrasound HR instead.  As HR noted in low 100's, decision was made by OB to convert from [emergency cesarean section] to urgent [cesarian section].  At the time of [cesarean section] noted uterine rupture.
>
> Michele realized that neither Dr. Rabie nor Dr. Gehrich had ever told her that the FSE had not been "picking up appropriately."

ECF No. 1 at PageID.38 ¶¶ 220–222.  The government argues that Plaintiffs knew enough in 2018 to seek counsel and file an administrative claim.  And because Plaintiffs apparently had Dr. Keller's Newborn Assessment in their records earlier, it reasons that they should not benefit just because Michele did not read the assessment until September 2024.  The government contends that Plaintiffs were not diligent and should have discovered the facts regarding causation much earlier.

22

But the court must also assume as true the several instances of alleged misstatements of fact set forth in the Complaint.  For example, the court must assume as true that:

- Dr. Rabie (1) falsely documented in Michele's medical record that "[i]n OR, [fetal heart rate] recovered to the 90-100s maternal heart rate verified to be different on pulse ox," *id.* at PageID.21 ¶ 138 (emphasis omitted); and (2) made the misstatement "to induce reliance by [Plaintiffs], and to avoid liability by the USA," *id.* at PageID.22 ¶ 145;

- Dr. Rabie, when asked by Michele, "emphatically denied tracking Michele's heart rate instead of D.G.'s," *id.* at PageID.23 ¶ 152, and falsely "insisted that . . . D.G.'s heart rate had 'recovered' at the time that the OR team had decided to 'slow things down,' stating 'I've looked at the fetal heart strips multiple times,'" *id.* at PageID.24 ¶ 153.  The intentional misstatements "deprived the Plaintiffs of a full understanding of the true facts," *id.* at PageID.25 ¶ 156, and were intended to "induce reliance by [Plaintiffs] and to avoid liability by the USA," *id.* at ¶ 157;

- In several alleged instances, when asked about the cause of D.G.'s injury, Dr. Gehrich made affirmative misstatements to Plaintiffs claiming that D.G.'s heart rate "recovered" to 110 bpm, that Tripler doctors had not been tracking Michele's heart rate rather than D.G.'s, that "30 minutes is the 'standard' to 'get the baby out,'" and that D.G.'s heart rate "must have crashed" after the fetal monitor was removed.  *Id.* at PageID.28–35.  These affirmative misstatements deprived Plaintiffs of a full understanding of the true facts, and were done "to induce reliance and evade liability."  *Id.* at PageID.35 ¶ 202.

Assuming those facts as true, it follows that Plaintiffs' cause of action did not accrue in 2017 because "a cause of action does not accrue under the FTCA when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes."  *Winter*, 244 F.3d at 1090.

23

Even if there is some tension here between (1) application of *Winter* and (2) the

Complaint's allegations that "[i]n September of 2024, for the first time, Michele

saw Dr. Keller's Newborn Assessment in D.G.'s records," ECF No. 1 at PageID.38

¶ 221, the court cannot resolve that tension at this motion-to-dismiss stage.  *See,*

*e.g.*, *Seven Arts*, 733 F.3d at 1254 (requiring the defense to be apparent from the

face of the complaint").

**B.    Equitable Tolling and Fraudulent Concealment (Equitable Estoppel)**

  *1.    Standards Defining Equitable Tolling and Equitable Estoppel*

   In opposition, Plaintiffs also invoke federal doctrines of equitable

tolling and fraudulent concealment, and argue that—even if their FTCA claim

accrued outside the limitations period in § 2401(b)—the statute was tolled or

Defendants are estopped from asserting the defense.[9]  *See, e.g.*, *Lukovsky v. City &*

*County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) ("[T]here are two

doctrines which may apply to extend the limitations period or preclude a defendant

---

  [9]  Because the FTCA has its own statute of limitations, federal (not state) tolling rules
apply.  *See, e.g.*, *Booth v. United States*, 914 F.3d 1199, 1204 n.4 (9th Cir. 2019) ("State rules on
minority tolling do not apply [in an FTCA case.]"); *see also Santos ex rel. Beato v. United
States*, 559 F.3d 189, 193 (3d Cir. 2009) ("[S]tate-law tolling statutes do not apply to the FTCA's
limitations period . . . ."); *Morales-Melecio v. United States*, 890 F.3d 361, 365 n.9 (1st Cir.
2018) ("While a tort claim under the FTCA substantively follows state law liability, its statute of
limitations provisions are governed by federal law, not state law [and] [t]herefore, state law
tolling statutes do not apply to the FTCA statute of limitations.") (citations omitted).

from asserting the defense—equitable tolling and equitable estoppel.").  One the

one hand,

> "Equitable tolling" focuses on "whether there was
> excusable delay by the plaintiff:  If a reasonable plaintiff
> would not have known of the existence of a possible
> claim within the limitations period, then equitable tolling
> will serve to extend the statute of limitations for filing
> suit until the plaintiff can gather what information he
> needs."

 *Id.* (quoting *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002)).

"'Equitable estoppel, on the other hand, focuses primarily on actions taken by the

*defendant* to prevent a plaintiff from filing suit, sometimes referred to as

'fraudulent concealment.'" *Id.* (quoting *Johnson*, 314 F.3d at 414).

"[L]ong-settled equitable-tolling principles instruct that generally, a

litigant seeking equitable tolling bears the burden of establishing two elements:

(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstances stood in his way." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052

(9th Cir. 2013) (en banc) (citations and internal quotation marks omitted).  "As to

the first element, '[t]he standard for reasonable diligence does not require an

overzealous or extreme pursuit of any and every avenue of relief.  It requires the

effort that a reasonable person might be expected to deliver under his or her

particular circumstances.'" *Id.* (quoting *Doe v. Busby*, 661 F.3d 1001, 1015 (9th

Cir. 2011)).   As to the second element, "a litigant must show that extraordinary

circumstances were the cause of his untimeliness and . . . made it impossible to file the document on time." *Id.* (quotation marks, brackets, and citation omitted). "Accordingly, '[e]quitable tolling is typically granted when litigants are unable to file timely documents as a result of external circumstances beyond their direct control." *Id.* (quoting *Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir. 2008)) (some brackets omitted).

Equitable estoppel (fraudulent concealment) operates similarly, but "tolls" the statute of limitations if a defendant fraudulently conceals "the existence of the cause of action." *See E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989) ("Under the equitable doctrine of fraudulent concealment, the applicable statute of limitations is tolled if the plaintiff proves the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence.") (citation and quotation marks omitted).[10]

A plaintiff must prove that the defendant "affirmatively misled" the plaintiff as to the operative facts that gave rise to the claim, and that the plaintiff

---

[10] "[F]raudulent concealment must be affirmatively pled . . . [and] where the basis of equitable tolling is fraudulent concealment, it must be pled with particularity under Rule 9(b)." *Bolos v. Waldorf=Astoria Mgmt. LLC*, 762 F. Supp. 3d 975, 1009 (D. Haw. 2025) (internal citation omitted); *see also Guerrero v. Gates*, 442 F.3d 697, 706–707 (9th Cir. 2006) (reiterating that to establish fraudulent concealment "[t]he plaintiff must demonstrate that he relied on the defendant's misconduct in failing to file in a timely manner and must plead with particularity the facts which give rise to the claim of fraudulent concealment") (citations and internal quotation marks omitted).

had neither actual nor constructive knowledge of these operative facts despite

diligence in trying to uncover them. *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090,

1094 & n.3 (9th Cir. 2005). That is, a plaintiff must establish "affirmative conduct

upon the part of [the defendant] which would, under the circumstances of the case,

lead a reasonable person to believe that [the plaintiff] did not have a claim for

relief." *Id.* at 1095 (quoting *Rutledge v. Boston Woven Hose & Rubber Co.*, 576

F.2d 248, 250 (9th Cir. 1978)); *see also Cervantes*, 656 F.3d at 1046 (reiterating

that fraudulent concealment—i.e., equitable estoppel—"halts the statute of

limitations when there is active conduct by a defendant, above and beyond the

wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from

suing in time") (quoting *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006)).[11]

To establish equitable estoppel against the government, a plaintiff

must first meet four traditional elements of equitable estoppel. *See United States v.*

*Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007). "Those elements are:

'(1) the party to be estopped knows the facts, (2) he or she intends that his or her

conduct will be acted on or must so act that the party invoking estoppel has a right

---

[11] "[T]he focus of the equitable estoppel analysis is not whether the plaintiff *knew* she had a cause of action—or even pursued some other form of litigation based on that knowledge—but whether the defendant's fraudulent concealment or misrepresentation deprived the plaintiff of a full understanding of the true facts, and thus, dissuaded the plaintiff from filing the claim at issue within the limitations period." *Est. of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011).

to believe it is so intended, (3) the party invoking estoppel must be ignorant of the

true facts, and (4) he or she must detrimentally rely on the former's conduct.'" *Id.*

(quoting *United States v. Hemmen*, 51 F.3d 883, 892 (9th Cir. 1995)); *Watkins v.*

*United States Army*, 875 F.2d 699, 709 (9th Cir. 1989) (en banc) (same elements).

"In addition, a party seeking to estop the government must establish two additional

factors: (1) 'the government has engaged in affirmative misconduct going beyond

mere negligence' and (2) 'the government's act will cause a serious injustice and

the imposition of estoppel will not unduly harm the public interest.'" *Gamboa-*

*Cardenas*, 508 F.3d at 502 (quoting *Pauly v. U.S. Dep't of Agric.*, 348 F.3d 1143,

1149 (9th Cir. 2003). In this context, "affirmative misconduct includes a

'deliberate lie' or 'pattern of false promises.'" *Wilkins v. United States*, 163 F.4th

636, 652 (9th Cir. 2025) (quoting *Mukherjee v. I.N.S.*, 793 F.2d 1006, 1009 (9th

Cir. 1986)).

### 2. *Application of Standards—The Requirements for Equitable Estoppel Are Met*

Here, without reaching equitable tolling, the Complaint clearly alleges

(with particularity) facts that would establish equitable estoppel. Plaintiffs allege

that Tripler doctors (1) knew the facts they were concealing, and (2) intended their

acts or words would be "acted on or must so act that the party invoking estoppel

has a right to believe it is so intended." *Gamboa-Cardenas*, 508 F.3d at 502. The

Complaint alleges that Plaintiffs (3) were "ignorant of the true facts," and

(4) detrimentally relied on the doctors' conduct. *Id.* Additionally, Plaintiffs have

alleged facts that would establish "affirmative misconduct going beyond mere

negligence," and "a serious injustice" that "would not unduly harm the public

interest." *Id.* That is, Plaintiffs have pled facts that, if true, would establish

"affirmative conduct upon the part of [the defendant] which would, under the

circumstances of the case, lead a reasonable person to believe that [they] did not

have a claim for relief." *Thorman*, 421 F.3d at 1095 (citation omitted).

The government argues that, although Plaintiffs have alleged

affirmative misconduct, they have not alleged "active conduct by a defendant

*above and beyond the wrongdoing* upon which the plaintiff's claim is filed."

*Cervantes*, 656 F.3d at 1046 (quoting *Guerrero*, 442 F. 3d at 707) (emphasis

added); *see also Lukovsky*, 535 F.3d at 1052 (rejecting tolling in an employment

context in part because "[plaintiff's] alleged basis for equitable estoppel is the

same as their cause of action"). It argues that Plaintiffs are merging the substantive

wrong with the alleged concealment to impermissibly circumvent the statute of

limitations. In arguing there are no allegations "above and beyond the

wrongdoing," the government relies (*see* ECF No. 32 at PageID.215) on the

following passage from *Lukovsky*:

> If defendant had told plaintiff that it would not plead the
> statute of limitations as a defense to any suit for age
> discrimination that he might bring, this would be a case
> for equitable estoppel; so also if defendant had presented

29

plaintiff with forged documents purporting to negate any
basis for supposing that plaintiff's termination was
related to his age.  Plaintiff tries to bring himself within
the doctrine by contending that stated reason for
termination was a ruse to conceal the plan to fire him
because of his age.  This merges the substantive wrong
with the tolling doctrine. . . . *It implies that a defendant is
guilty of fraudulent concealment unless it tells the
plaintiff, "We're firing you because of your age."  It
would eliminate the statute of limitations. . . .*

535 F.3d at 1052 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th

Cir. 1990)) (brackets omitted; emphasis added by the government).

But Plaintiffs have indeed alleged (with particularity) many instances

of alleged affirmative conduct that goes "above and beyond the wrongdoing."  For

example, they allege that a doctor falsified medical records regarding recovery of

D.G.'s fetal heart rate "to induce reliance by [Plaintiffs], and to avoid liability by

the USA."  ECF No. 1 at PageID.22 ¶ 145.  The doctor allegedly falsely told

Michele that "D.G.'s heart rate had 'recovered' at the time that the OR team had

decided to 'slow things down,'" telling her "I've looked at the fetal heart strips

multiple times.'"  *Id.* at PageID.24 ¶ 153.  The affirmative falsehoods were

allegedly done to "induce reliance by [Plaintiffs] and to avoid liability by the

USA."  *Id.* at PageID.25 ¶ 157.  Another doctor falsely told Michele that Tripler

doctors had not mixed Michele's heart rate up with D.G.'s, again "to induce

reliance and evade liability."  *Id.* at PageID.35 ¶ 210.  In almost all instances,

Plaintiffs are not alleging that the false statements were themselves negligent; they

30

are alleging that the statements were made after the alleged negligence to *conceal it*—affirmative conduct that would indeed be "above and beyond the wrongdoing upon which the plaintiff's claim is filed." *Cervantes*, 656 F.3d at 1046.[12]

Plaintiffs' allegations are much more like the example quoted in *Lukovsky* that *would* constitute equitable estoppel: "if defendant had presented plaintiff with forged documents purporting to negate any basis for supposing that plaintiff's termination was related to his age." 535 F.3d at 1052 (quoting *Cada*, 920 F.2d at 451) (brackets omitted); *see also, e.g.*, *In re Park W. Galleries, Inc.*, 732 F. Supp. 2d 1181, 1190 (W.D. Wash. 2010) (applying *Lukovsky*, reasoning that "*[i]n the absence of a misrepresentation or conduct by defendants aimed at concealing the underlying tort alleged in the FAC* or otherwise preventing plaintiffs from timely asserting their rights, equitable estoppel is not applicable") (emphasis added); *S.E.C. v. Fraser*, 2010 WL 5776401, at *11 (D. Ariz. Jan. 28, 2010) (distinguishing *Lukovsky* because "[w]here the wrongdoing in *Lukovsky* was not fraudulent, the wrongdoing alleged in this case involves both a scheme to defraud investors and misrepresentations that were allegedly designed to conceal the

---

[12] The allegation that Dr. Sitler "told Michele that Pitocin does ***not*** increase the risk of uterine rupture in the context of a TOLAC/VBAC," ECF No. 1 at PageID.6 ¶ 26—to the extent that the statement is wrong and is the basis for a claim of malpractice—would probably not be "above and beyond the negligence" for purposes of equitable estoppel, despite the Complaint's allegations that the statement "was an affirmative misstatement to Michele and a fraudulent concealment of the risks posed by Pitocin in the context of a TOLAC/VBAC," *id.* at ¶ 27. In that instance, the malpractice would duplicate the fraud.

31

scheme from the SEC and the general public") (citation omitted); *Rushing v. Williams-Sonoma, Inc.*, 2022 WL 2833980, at *8 (N.D. Cal. 2022) (finding no equitable estoppel because the affirmative misconduct "related to the underlying wrongdoing *rather than an effort to prevent [plaintiff] from being able to sue*") (quoting *Johnson*, 314 F.3d at 414) (emphasis added).

In sum, even if Plaintiffs' claim had accrued outside the limitations period, Plaintiffs have met their burden at this motion-to-dismiss stage to demonstrate that the statute of limitations should not bar the claim under the doctrine of equitable estoppel/fraudulent concealment.

## V. <u>CONCLUSION</u>

Accepting the well-pleaded allegations of the Complaint as true, Plaintiffs' FTCA claim did not accrue more than two years before the administrative claim was filed on December 18, 2024.  And even if it did, equitable estoppel applies as pled to preclude the statute of limitations defense. Defendant's Motion to Dismiss, ECF No. 21, is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 17, 2026.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge